Bank v. Taylor.

THE FIRST NATIONAL BANK OF ST. MARYS, KANSAS,
v. W. H. TAYLOR *et al.*

**No. 13,410.** *(76 Pac. 425.)*

SYLLABUS BY THE COURT.

1. CHATTEL MORTGAGE — *Oral Agreement for Lien Construed.*
Where money is advanced upon the condition and consideration
that cattle purchased with it shall stand as security for another
debt, and it is orally agreed that the cattle, when fed and fattened,
shall be delivered to, and sold by, the parties furnishing the money,
and that the proceeds shall be used by them in satisfying the debt,
the agreement and the delivery of the cattle under it constitute a
verbal chattel mortgage which is binding upon the parties and
those who have knowledge of its existence.

2. ———— *Rights of Senior and Junior Mortgagees Distin-
guished — Waiver by Senior Lien-holder.* Where a creditor
had a paramount lien on the property of a debtor and another
creditor had a subordinate lien on a part of the property, and the
former had knowledge of the junior lien, and where the holder of
the senior lien was requested by the junior lien-holder to pursue the
property not covered by the junior lien, which was accessible and
sufficient to satisfy the senior lien, and where part of the property
available to the senior lien-holder only was sold, and the proceeds
of the sale, which were more than sufficient to pay the debt, were
placed in the hands of the senior lien-holder, which, after being
advised of the source from which the money was derived, surren-
dered the same for other purposes, it is *held,* that the senior
lien-holder waived its right to claim a lien paramount to that of
the junior mortgagees, and that it would be inequitable to per-
mit it to recover from them the amount which they obtained
under their lien.

Error from Leavenworth district court; J. H. GILL-
PATRICK, judge. Opinion filed April 9, 1904. Af-
firmed.

STATEMENT.

THIS was an action by the First National Bank of
St. Marys to recover from W. H. Taylor and J. F.
Taylor, commission merchants at Kansas City, the
sum of $633.19, the proceeds of the sale of certain

mortgaged cattle and hogs alleged to be in the hands of the Taylors, to which the bank asserted a right. The following special findings of fact and conclusions of law were made and stated by the trial court:

"FINDINGS OF FACT.

"1. On the 10th day of November, 1899, one Josiah Reed was, and had been for some time prior thereto, indebted to the defendants in the sum of $642.57; that on or about the 10th day of November, 1899, the defendants advanced to the said Josiah Reed $1866.92, with which to purchase sixty-four head of Colorado and Panhandle steers, for which last amount Josiah Reed executed to the defendants his promissory note secured by a chattel mortgage on said cattle; these cattle were shipped to Jackson county, Kansas, where the chattel mortgage was duly filed with the register of deeds of said county; that as a part of the consideration for the defendants' advancing to Reed $1866.92 with which to purchase the cattle, Reed agreed with the defendants at that time that when the cattle were fattened and ready for market they should be shipped to the defendants at Kansas City, Kan., for sale on the Kansas City market; and after paying back to the defendants the money advanced, with interest, for the purchase-price thereof, the defendants were to take out of the proceeds of the sale of said cattle also their claim of $642.57, which was done.

"2. In March, 1900, Josiah Reed gave to McGee, Zooks, Whitford & Co., a commission firm in Kansas City, Kan., a first mortgage on thirty-two head of other cattle for $1349.25; that said mortgage was duly filed with the register of deeds in Jackson county, Kansas, where said cattle were located.

"3. On or about the 14th day of May, 1900, Reed gave to the plaintiff a mortgage for $2370 on all of the cattle covered by the defendants' mortgage and on the cattle covered by the mortgage to McGee, Zooks, Whitford & Co., and also on four cows, 100 head of hogs, 100 acres of growing corn, more or less, eight

horses, 1500 bushels of corn in crib, two wagons, five sets of harness, and all farming implements, all of said property was located in Jackson county, Kansas, where said mortgage was duly filed, on or about the 15th day of May, 1900, with the register of deeds of said county; the mortgage to the bank was a second mortgage on the cattle as to the defendants' mortgage, and the mortgage to McGee, Zooks, Whitford & Co.

"4. On or about the 21st day of July, 1900, Reed gave to the plaintiff another mortgage for $600 on the same cattle; also 150 head of hogs, 100 acres of growing corn, eight head of horses, two wagons, five sets of harness, and all farming implements, all of which were located in Jackson county, Kansas, where said mortgage was filed with the register of deeds of said county on or about the 25th day of July, 1900. This mortgage to the plaintiff covered practically the same as its first mortgage. Both of the plaintiff's mortgages were subject to the defendants' and McGee, Zooks, Whitford & Co.'s mortgages. The plaintiff's mortgages were due, respectively, September 1 and 21, 1900.

"5. On or about the 16th day of October, 1900, Reed shipped to the defendants, at Kansas City, Kan., for sale on the Kansas City market, sixty-five head of the hogs covered by the bank's mortgages; these hogs brought $929.56. Under the instructions from Reed at that time, $250 of the proceeds were used to take up a draft drawn by Reed on the defendants, and the balance of $679.56, was held by these defendants under Reed's instructions until October 18, 1900, when Reed shipped to the defendants ninety-six head of fat cattle covered by the defendants' mortgage, McGee, Zooks, Whitford & Co.'s mortgage, and the bank's mortgage; as hereinbefore stated. The defendants had no actual knowledge of plaintiff's mortgage until after the shipment of hogs and cattle to them by Reed, nor until after Reed gave instructions as to the distribution, and after paying the defendants, the Taylor brothers. The total net receipts of the hogs and cattle, after paying Reed's draft of $250, amounted to

$6319.33 ; this amount was distributed by Reed's instructions, on or about the 18th or 20th day of October, 1900, as follows :

| | | |
|---|---:|---:|
| To Taylor & Taylor, in discharge of their claim for the money advanced upon said cattle | $1,944 | 70 |
| To Taylor & Taylor, under their verbal mortgage with Reed | 642 | 57 |
| To McGee, Zooks, Whitford & Co., on their mortgage | 1,349 | 25 |
| To Josiah Reed, cash | 10 | 00 |
| To plaintiff, First National Bank of St. Marys | 2,372 | 91 |
| Total disbursements | $6,319 | 33 |

The defendants' claim for the money advanced to Reed at the time of the distribution, with interest at ten per cent., amounted to $1944.70. After this distribution had been made,.,there still remained due the plaintiff, under its mortgage, the sum of $633.19.

"6. The proceeds of the sixty-four head of cattle upon which the defendants held their mortgage amounted to considerably more than the amount retained by the defendants to pay both their claims.

"7. After the proceeds of the first shipment of hogs and cattle had been distributed, and on or about October 25, 1900, the plaintiff was informed by the defendants that Reed still had, on his farm in Jackson county, Kansas, a large lot of fat hogs and the balance of the property, all of which was covered by its mortgages, amounting to about $1900, and the defendants requested the plaintiff to pursue it, and apply the same on the balance of its claim under its mortgage, which it promised to do. A few days later sixty-seven of these fat hogs were shipped to the Kansas City market, to the Clay-Robison Commission Company, and the bank was again notified by the defendants of such fact, and that $700 of the proceeds thereof had been sent to the plaintiff's bank, and plaintiff was requested to protect itself.-

"8. On or about the 9th day of November, 1900, Reed shipped to the Clay-Robison Commission Company, at Kansas City, Kan., to be sold on the Kansas City market, the said sixty-seven head of hogs covered by the plaintiff's two mortgages, above mentioned, and of which shipment the plaintiff was notified by the defendants at that time. The net proceeds

of this second shipment of hogs amounted to $890.19. Of that amount, $700 was, on or about November 13, 1900, deposited with the First National Bank of St. Marys, Kansas, the plaintiff herein, to pay Reed's debts.

"9. After the sale of the last shipment of hogs, there still remained in Jackson county, Kansas, and undisposed of, the following mentioned personal property, covered by the plaintiff's mortgages, to wit: About fifteen or twenty head of hogs, worth about $60; about thirty or thirty-five acres of corn, worth about $450; seven or eight horses, worth about $340; two cows and two calves, worth about $90; two wagons, five sets of harness and all the farming implements mentioned in said mortgages, worth about $100; that the total value of the property undisposed of was then about $1050; that all of said last-mentioned property remained in the possession of Reed, on his farm in Jackson county, Kansas, within reach of the plaintiff, and undisposed of until as late as the 1st day of December, 1900, excepting what little corn Reed may have fed to the stock after November, 1900.; the plaintiff made no effort to take this property into its possession under its mortgage, and has never made any effort to pursue it, and apply it upon its mortgage debt.

"10. All of the property covered by the plaintiff's mortgages was left in the possession of the mortgagor, Reed, by the consent of the plaintiff, and with the consent of the plaintiff that when the cattle and hogs were fattened and ready for the market Reed might sell them. Plaintiff allowed Reed to ship and sell the cattle and hogs (knowing when the cattle were shipped), and without any supervision on plaintiff's part, and without knowledge to whom such shipment was to be made, and without control of Reed in such sale and shipment when the same were made.

"11. That Josiah Reed is a married man and entitled to the exemptions allowed by law to heads of families, although such exemptions were not claimed by him or his wife, and that his wife did not join in the execution of the mortgages to the plaintiff, and

that said mortgages included the property of the kind exempt to him by law as the head of a family, but there was enough property covered by plaintiff's mortgages free from exemptions to satisfy defendants and all the claims involved.

"12. That on the 18th day of October, 1900, both of plaintiff's mortgage claims against Josiah Reed were due and wholly unpaid ; the conditions contained in Reed's mortgages to it were broken, and plaintiff was entitled to the possession of the property covered by said mortgages, subject to the first mortgages to the defendants and to McGee, Zooks, Whitford & Co., but the plaintiff never asserted such right of possession.

"13. Reed, the mortgagor, owed the defendants the amount sued for in this action and agreed to pay it as a part of the consideration in the contract for the purchase of the sixty-four head of cattle covered by the mortgage from Reed to the defendants, the Taylor Brothers, the same being a condition precedent to the advancement of the money for such purchase.

"14. Reed, the mortgagor, after the sale of the second shipment of hogs, deposited $700 of the proceeds thereof in the plaintiff's bank *with which to pay his debts;* but he attempted to cover such remittance or credit to plaintiff's bank by a pretended authority to Caroline Reed, who was a daughter of the mortgagor, living with him, to use and control the same ; but there is no evidence of any indebtedness on the part of the mortgagor to his daughter, Caroline, nor any lien shown on the property in her favor.

"15. The plaintiff knew of the sale of the last shipment of hogs immediately after the same was made, and of the disposition of $700 of the proceeds thereof, as herein found ; the plaintiff had the said $700 in its bank and in its control, and the payment of such money, if any, to Caroline Reed, was made by plaintiff with full knowledge of the situation, and the relations of the parties, or it should have known such facts, and as found herein.

3—69 KAN.

"CONCLUSIONS OF LAW.

"1. The plaintiff waived its right as mortgagee by giving the mortgagor the right and authority or permission to ship and sell the mortgaged property as he did; and the mortgagor's payment to the defendants in good faith of the proceeds of the sale of the cattle was justifiable in law.

"2. On the other hand, the plaintiff, after such appropriation, and with full knowledge of defendant's claim, by neglecting to apply the proceeds of the second sale of hogs to the mortgage debt, if it did so neglect, and to appropriate any of the other property held by the mortgagor, and covered by his mortgages to plaintiff, in satisfaction of its claim or balance due, is estopped from any reclamation from the defendants herein.

"3. The plaintiff claims that the defendants had no statutory lien or mortgage, or other lien to justify the payment to them, yet, with full knowledge permitted funds from mortgaged property due it to be diverted through its own hands and bank to the daughter, Caroline Reed, who had no claim or lien against the mortgagor or the mortgaged property; this was a clear violation of the equitable obligation to make the most of all that is available in the interest of inferior claimants. To hold otherwise opens the door to a dishonest debtor to place his money beyond the reach of his creditors. The disbursement of the said $700 by the plaintiff to the mortgagor's daughter, if it did so, and the failure to secure itself by other available property, leaves plaintiff no ground for complaint in the premises, and it cannot recover in this action.

"4. Under all these facts, it is clear that the plaintiff has received from the sale of a part of the mortgaged property and has had in its possession and under its control enough of the proceeds of the mortgaged property, and had either applied the same, or should have done so, to its mortgage debt, which was more than enough to settle its entire mortgage claim; and that for a considerable length of time after the sale and disposal of the cattle and hogs men-

tioned under the various mortgages had been made there still remained within the reach of the plaintiff, and upon which its mortgages were valid liens, more than enough property to satisfy the claim of $633.19, sued on in this action. The plaintiff has never attempted to pursue any of this other property, to take possession of it, or to apply the same toward its mortgage debt.

"Under such state of facts, the plaintiff has no cause of action against the defendants, who legally appropriated $642.57 of the proceeds of the sale of the cattle to pay a just debt owed them by Reed, under an agreement with him to do so. Judgment should, therefore, be entered for the defendants."

In accordance with the findings of fact and conclusions of law the court entered judgment in favor of the defendants. The plaintiff alleges error.

*Crane & Woodburn Bros.*, for plaintiff in error.

*J. C. Petherbridge*, and *O. C. Taylor*, for defendants in error.

The opinion of the court was delivered by

JOHNSTON, C. J. : The principal question presented here is whether the facts in the case justified the decision of the trial court denying a recovery to the bank of the proceeds of mortgaged property which the Taylors applied to the satisfaction of their verbal mortgage. There was no substantial dispute as to the existence and validity of the several mortgages involved nor in regard to their relative positions as to seniority, except as to the unwritten mortgage from Reed to the Taylors. Reed gave a first mortgage to the Taylors on sixty-four head of cattle to secure an indebtedness of $1866.92. He gave to McGee, Zooks, Whitford & Co. a first mortgage on thirty-two head of other cattle to secure a debt of $1349.25. Later he

gave a mortgage to the bank to secure a debt of $2370, which covered the property previously mortgaged to the Taylors and to McGee, Zooks, Whitford & Co., on which it was a second mortgage, and it also covered a lot of horses, cows, hogs, farming implements and harvested and growing corn, upon which it was a first mortgage. Subsequently Reed gave another mortgage to the bank on substantially the same property that was covered by the one last mentioned, to secure an indebtedness of $600. That the debts secured by both of the mortgages executed by Reed to the bank were *bona fide* was not questioned, nor could there be any doubt that the mortgages were valid and created liens which were superior to that claimed by the Taylors under the verbal mortgage. It was also conceded that when the stock was shipped to the Taylors they paid themselves the debt secured by both their written and verbal mortgages, and only forwarded to the bank $2372.91, which left unpaid on the bank's indebtedness the sum of $633.19.

There is a contention as to the status of the claim of the Taylors for $642.57, and whether it was in any sense a lien on the sixty-four head of cattle. It was not in writing and had never been reduced to judgment. There was an agreement, however, that the cattle should stand as security for that debt. It was part of the consideration for the larger and later loan obtained to purchase the cattle, and the money was advanced by the Taylors to Reed upon the condition that the cattle, after being fed and fattened by him, should be returned to the Taylors, who would then sell them and take out of the proceeds of the sale the amount of the claim. Under this agreement they obtained an equitable lien on the cattle which was certainly binding as between themselves and Reed, and

under our decisions the contract constituted a verbal chattel mortgage as to the parties and those having actual notice of the contract about the legality of which there can be no doubt ; at least, after the possession of the cattle was delivered to the Taylors in pursuance of the contract.    ( *Bates v. Wiggin*, 37 Kan. 44, 14 Pac. 422, 1 Am. St. Rep. 234 ; *Weil v. Ryus*, 39 id. 564, 18 Pac. 524.)    The court was, therefore, warranted in treating the oral agreement as a lien, binding upon the contracting parties, and one which could not be ignored by those having knowledge of its existence.

In determining the rights of the parties the court was not only authorized, but also required, to apply equitable principles.

"The general rule enforced in equity is that, where one creditor is secured by mortgage on several pieces of property while another creditor is secured by a junior mortgage on only a part of the property, the prior creditor, when chargeable with actual notice of the rights of the junior creditor, is bound to exhaust his security on the property not covered by the junior lien, and that he must account to the junior lien-holder if he releases his security on, or pays over to the mortgagor, the proceeds of the property not covered by the lien of the junior mortgagee, after actual notice of the junior lien." ( *Burnham v. Citizens' Bank*, 55 Kan. 545, 551, 40 Pac. 912.    See, also, *M'Lean, Assignee, v. Lafayette Bank*, 4 McLean [C. C.] 430, Fed. Cas. No. 2889 ; *Dunlap v. Dunseth*, 81 Mo. App. 17 ; *Aldrich v. Cooper*, 8 Ves. 382 ; *Turner v. Flennikin*, 164 Pa. St. 469, 30 Atl. 486, 44 Am. St. Rep. 624 ; 2 Jones, Mortg. § 1628.)

After the sale of the stock by the Taylors and the payment by them to the bank of $2372.91, it had full knowledge of the junior lien of the Taylors under their verbal mortgage.    It was also well acquainted

with the fact that there was abundant property cov-
ered by its mortgage alone to satisfy the balance of
its debt. There remained at that· time mortgaged
property to the value of $1900 to secure a debt of only
$633.19, which the junior mortgage did not cover.
The attention of the bank was specially called by the
Taylors to this unexhausted security, with the request
it avail itself of that property to satisfy its debt. The
bank then promised to look to that property or fund to
discharge the balance due under its mortgage. If it
had done as it agreed to do it would have found avail-
able property which in value was treble the amount
of the mortgage debt.

Again, some of the property mortgaged to the bank
and not to the Taylors was shipped to market with
the knowledge of the bank, and the proceeds of the
sale were returned and deposited in the bank. It had
notice of the character of the deposit and the source
from which it was derived, and, although promptly
advised by the Taylors to protect itself from this de-
posit, the funds so placed in its hands were surren-
dered and paid out by it. The deposit was $700,
which was more than sufficient to discharge its mort-
gage debt. Reed's purpose was to use this deposit
for the payment of his debts, and, while he placed it
to the credit of his daughter, there was nothing to
show that she had any claim against him or any lien
upon the property sold. The bank, therefore, had
abundant opportunity to protect itself. It promised
to do so, and the loss of the sum which was available
to it alone was due to its wilful neglect.

When the bank agreed with the holders of the junior
lien to pursue the property covered by its mortgage
alone, which was accessible and sufficient, and to ap-
ply the same on the balance of its debt, it in effect

elected to rely only on that fund, and it would be inequitable now to allow it to change its position. This agreement, together with the surrender of the fund which was in its hands and which was not available to the junior creditor, constituted a waiver of any right to the security taken by the Taylors, and, under the general principles of equity, defeats a recovery from them.

We think there was sufficient testimony to sustain the findings of fact made by the court, and the judgment which was entered on those findings should be affirmed.

All the Justices concurring.